1 | MORRIS POLICH & PURDY LLP
David J. Vendler, Esq. (SBN 146528)
2 | Email:   dvendler@mpplaw.com
1055 West Seventh Street, Suite 2400
3 | Los Angeles, California 90017
Tel.:   (213) 417-5100
4 | Fax:   (213) 488-1178

5 | MICHAEL R. BROWN, APC
Michael R. Brown, Esq. (SBN 65324)
6 | Email:   mbrown@mrbapclaw.com
18101 Von Karman Avenue, Suite 1900
7 | Irvine, California 92612
Tel.:   (949) 435-3888
8 | Fax:   (949) 435 3801

9 | Attorneys for Plaintiff, ADRIANA ROVAI
and all others similarly situated

10

11 | **UNITED STATES DISTRICT COURT**

12 | **SOUTHERN DISTRICT OF CALIFORNIA**

13

14 | ADRIANA ROVAI, individually, and on behalf of the class of all others similarly situated,

Case No.:  14-CV-1738-BAS-WVG

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **BREACH OF CONTRACT**
2. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
3. **VIOLATION OF UNFAIR COMPETITION LAW**
4. **DECLARATORY RELIEF**
5. **INJUNCTIVE RELIEF**
6. **FRAUD**
7. **NEGLIGENCE**
8. **NEGLIGENT MISREPRESENTATION**
9. **VIOLATION OF 26 U.S.C. § 6050H**

**DEMAND FOR JURY TRIAL**

Plaintiff,

vs.

SELECT PORTFOLIO SERVICING, INC.,

Defendant.

COMES NOW plaintiff, Adriana Rovai ("Plaintiff"), who, on behalf of herself and all others similarly situated (collectively "Class Members"), complains as follows against Defendant Select Portfolio Servicing, Inc. ("SPSI" or "Defendant").

## I.

## SUMMARY OF THE ACTION

1.      For almost all owners of real property, the mortgage interest deduction is their largest single tax deduction and can amount to hundreds, thousands, or even tens of thousands of dollars per year in tax savings.  The Internal Revenue Service ("IRS"), tax-payer-borrowers, and accounting professionals all rely on IRS Form 1098 ("Form 1098") to determine the amount of mortgage interest the tax-payer-borrower(s) have paid during a given year so as to know how much can be deducted from their gross income pursuant to 26 U.S.C. Section 163(a).  The statute that mandates the issuance of Forms 1098 is 26 U.S.C. § 6050H ("Sec. 6050H").  It states very simply that:

Any person[1]—

(1) who is engaged in a trade or business, and

(2) who, in the course of such trade or business, receives from any individual interest aggregating $600 or more for any calendar year on any mortgage, must report on Forms 1098 the amount of mortgage interest they "receive" if the amount is over $600.

2.      This case arises from SPSI's systematic failure to report millions of dollars in mortgage interest that it has actually received from consumers holding negative amortization "Option Arm" loans – and potentially other types of loans

---

[1] Notably, the statutory language is not limited to actual lenders, but uses the much broader term "person."  In short, it is simply the receipt of the interest that triggers the reporting obligation.  Thus, mortgage servicers who do not actually own the notes are still the party responsible for issuing Forms 1098.

where interest was deferred by borrowers.[2]  SPSI's intentional concealment of its improper and illegal reporting practice has not only caused tens of thousands of tax-payers to unknowingly file erroneous tax returns -- which will have to be unwound at substantial cost -- but may have also caused some Class Members the damage of *permanently* losing valuable tax deductions by virtue of the passage of the 3-year statute of limitations for amending tax returns imposed by 26 U.S.C. § 6511.

## II.
## <u>HOW NEGATIVE AMORTIZATION LOANS WORK</u>

3.     SPSI is one of the nation's leading mortgage servicing companies and is alleged on information and belief to be a subsidiary of Credit Suisse Group, a leading global financial services company.  As part of its business, SPSI has owned, serviced and/or acquired the servicing rights to thousands of loans, both in California and nationally.  As a regular part of its business of servicing loans, it "receives" mortgage interest from mortgagors like Plaintiff and the other Class Members.

4.     It is alleged on information and belief that in the case of Plaintiff's mortgage loan ("loan"), in or about December 2011, SPSI by written contract, either acquired Plaintiff's loan or acquired the right to service Plaintiff's loan from Bank of America, N.A. ("BANA") in a transaction that involved hundreds, thousands, or even tens of thousands of other loans.  It is further alleged on information and belief that at some time after Plaintiff entered into her loan, but prior to its acquisition by SPSI, her

---

[2] An "Option Arm" loan provides borrowers with four (4) different payment "options" in any given month.  The first "option" is to make a full payment of the principal and interest due under the note.  The second "option" is to pay "Interest Only."  The third "option" is to pay the "Minimum Payment," which may be, and often is, less than the interest then due on the note.  The fourth "option" is to make accelerated payments on a 15-year amortization schedule.  The marketing objective of the "Option ARM loan" was to allow consumers to minimize their monthly payment so that they could "afford" to purchase a home based upon their available cash flow.  Thus, consumers with these loans overwhelmingly chose the "Minimum Payment" option.

loan was sold by its initial issuer and then at some point in time may have been packaged into an investment vehicle known as Residential Mortgage-Backed Securities ("RMBS").  In these investment vehicles, a special purpose entity is set up to own the packaged mortgages.  Shares of the entity (or a grouping of similar entities) that owns the RMBS are then sold to investors.  Servicers like SPSI act as mortgage-payment collectors for the investors who, through their shares in the RMBS, hold slices of the complex packaged residential debt.  Thus, Plaintiff alleges that in doing the things alleged herein, SPSI may have been acting as the agent for the entity holding the notes of the Plaintiff and Class Members.

5. The entities holding the notes are not generally disclosed to borrowers. However, Plaintiff is informed and believes that the entity that actually owns Plaintiff's loan is: U.S. Bank National Association, as trustee, on behalf of the holders of the HarborView Mortgage Loan Trust 2006-1 Mortgage Loan Pass-Through Certificates, Series 2006-1 ("USB").  Plaintiff may seek to amend this complaint when it is determined more precisely the relationship that exists between SPSI and USB. Many of the loans that were packaged into RMBS were, like Plaintiff's loan, negative amortization loans.  But, irrespective of which entity may actually own Plaintiff's note, SPSI is nonetheless the "person" that, in the regular course of its business, "received" the mortgage interest payments in excess of $600 from Plaintiff and the Class members during the tax-years subject to this suit and therefore is the party subject to 26 U.S.C. § 6050H.

6. Negative amortization loans of the type Plaintiff has, generally provide the borrower the option in any given month to pay a "Minimum Payment," which is often, but not always, less than the interest due for the month.  This is why loans with negative amortization features are often referred to as "Option ARM" loans.  In Plaintiff's case, SPSI either acquired Plaintiff's loan outright or acquired the servicing rights to Plaintiff's loan from Bank of America, N.A. ("BANA") pursuant to a contractual agreement with SPSI.

7.     Because negative amortization loans were primarily marketed to consumers who wanted to minimize their monthly payment so they could "afford" a home that would otherwise be too expensive for them based upon their available cash flow, borrowers with negative amortization loans, including Plaintiff, overwhelmingly chose the "Minimum Payment" option when selecting which "option" to pay in any given month.  This way, they could lower their monthly payment to an amount they could manage by "deferring" (for months or even years) a portion of the interest that would otherwise have been due in the month of their payment.  The interest that was "deferred" would then be added to the loan balance to be paid back later, (with additional interest at the same rate as the principal).  Many people took these loans as part of tax planning with the express idea that they would be deferring tax deductible interest until a later time, when the deduction would be available to them.

8.     Choosing the "Minimum Payment" option would usually, but not always, result in negative amortization, meaning that as interest was deferred, the overall loan balance would increase rather than decrease.  (However, in or about 2009, interest rates and the mortgage indexes plummeted and this caused a situation where the interest rate on some consumers' loans may have "adjusted" to a rate where the monthly interest obligation fell below the level of the "Minimum Payment."  If this happened, the positive difference between the "Minimum Payment" and the monthly interest due should be allocated first to paying back any previously deferred interest, and then to principal as set forth in the contractual loan agreement).

9.     Generally, a limit of 115% of the original principal amount was placed on the amount of negative amortization consumers were allowed to incur.  It is not known exactly in which tax-year SPSI first began servicing negative amortization loans, but while such loans have existed for a long time, such loans first began to flood the consumer market in or about 2004.

**FIRST AMENDED CLASS ACTION COMPLAINT**

## III.

## PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS

**A.    Plaintiff's Negative Amortization Loan**

10.    Plaintiff owns a single family home located at 5049 Midas Ave., Rocklin, California which was at all times relevant hereto, her primary residence.  On or about November 10, 2005, Plaintiff obtained a negative amortization loan in the principal amount of $524,000 from First Magnus Financial Corporation.  A true and correct copy of her note is attached hereto as Exhibit "A."

11.    Her note provided Plaintiff with a "Minimum Payment" option similar to that previously described.  Plaintiff took advantage of the "Minimum Payment" option which resulted in negative amortization during the loan's pendency, such that when SPSI took over servicing her note in December of 2011, Plaintiff's loan-balance was $533,013.02, or $9,013.02 *above* the original principal amount of the loan.  *The entirety of this $9,013.02 is unpaid interest, since it was charged to Plaintiff for her use of the original principal*.  This interest was incurred, but not paid, by the Plaintiff in earlier years of her loan.

12.    Since SPSI took over servicing Plaintiff's loan in December 2011, Plaintiff has made all of her payments required under her note to SPSI.  During tax year 2011, Plaintiff's payments to SPSI totaled $2,698.20.

13.    In or about February 2012, Plaintiff received a Form 1098 from SPSI supposedly reflecting the amount of mortgage interest that it had received from Plaintiff during tax-year 2011.  Although Plaintiff had paid $2,698.20 to SPSI on her note during 2011, the Form 1098 she received reflected only $1,443.58 in mortgage interest paid.  This is the amount of interest accrued and paid on the 2011 balance owed.  The Form 1098 for tax-year 2011 also reflected that Plaintiff had paid $1,254.62 in supposed "principal."  A true and correct copy of Plaintiff's 2011 Form 1098 is attached hereto as Exhibit "B" and incorporated herein by this reference.

14.    SPSI's method for calculating mortgage interest is wrong because it assumes that the entire loan balance that it took over in December 2011 was comprised of principal, and fails to recognize that the interest that was previously deferred does not lose its character as interest simply because it is paid back at a later time, or to a different mortgage servicer.   Because Plaintiff still owed previously deferred interest on her note as of the date that SPSI took over her loan, SPSI should have credited all of Plaintiff's payment toward retiring Plaintiff' deferred interest balance before crediting any of her payments to principal.   Indeed, Plaintiff's note dictates that payments shall first be allocated to unpaid interest and only then to principal.   This method of allocation of payments to unpaid interest first is consistent with tax law generally.

15.    To repeat, until all of Plaintiff's previously deferred interest was paid in full, none of Plaintiff's payments should have been credited to repayment of principal. Just by way of example, Wells Fargo Bank, N.A., another leading national mortgage lender (correctly) credits payments of previously deferred mortgage interest on the Forms 1098s it issues to its borrowers.   Attached as Exhibit "C" and incorporated herein by this reference is a true and correct copy of a redacted Form 1098 issued to a Wells Fargo borrower that specifically denotes the customer's payment of previously deferred interest and includes that amount as mortgage interest paid.   Further, it is alleged that Bank of America, N.A., the predecessor to Plaintiff's loan, also now properly includes payments of deferred interest on the Forms 1098 it issues.

16.    In February 2013, Plaintiff received her Form 1098 for tax year 2012. Again, SPSI incorrectly calculated the mortgage interest she had paid because it, too, failed to take into account the deferred interest that was paid on her loan.   A true and correct copy of the 2012 Form 1098 is attached hereto as Exhibit "D" and which is incorporated herein by this reference.   For tax years 2011 and 2012 described above, and others as well, Plaintiff relied upon the incorrect information contained in the Form 1098s that were sent to her by defendant, and as a result she both: (1) filed

**FIRST AMENDED CLASS ACTION COMPLAINT**

erroneous tax returns in those years and perhaps others (insofar as her returns claimed only the amount of mortgage interest that had been stated on her Form 1098) and (2) received smaller tax deductions in at least the 2011 and 2012 tax years than she would have received had the proper information been provided to her on her Form 1098 by SPSI.

**B.     Borrowers, Tax Professionals And The IRS All Rely Upon The Mortgage Interest Stated In Form 1098s.**

17.     Plaintiff alleges that reliance on Forms 1098 by consumers and their tax-preparers without cross-checking is the norm since: (1) mortgage lenders/servicers like SPSI have the legal duty under 26 U.S.C. § 6050H to calculate and report those amounts accurately; (2) the IRS relies exclusively on the amounts contained in the 1098 forms it receives; and (3) the IRS maintains a policy whereby it will reject any attempt by tax-payers to claim different amounts of interest from those appearing on the tax-payer's Form 1098.

18.     The IRS's policy is evidenced by Exhibit "E" attached hereto and incorporated herein by this reference, which is a redacted IRS letter sent to tax-payers other than Plaintiff who also had a negative amortization mortgage with a different lender and who tried to independently calculate and submit to the IRS the correct amount of deferred interest that they had paid.  The IRS rejected the tax-payers' return stating, for instance, in Exhibit "E" that "we [the IRS] cannot adjust the amount claimed on schedule A for mortgage interest, without a corrected Form 1098…"

19.     It is further alleged that the IRS Office of the Taxpayer Advocate has taken the position that the resolution of Form 1098 reporting disputes between an issuer and the recipient is a "legal matter" that the IRS would not interfere with. Attached hereto as Exhibit "F" is a true and correct email exchange between counsel for plaintiffs and the IRS (relating to Bank of America, N.A. also pursuing the same type of wrongful interest reporting policy).

**FIRST AMENDED CLASS ACTION COMPLAINT**

20.    It is further alleged that although the Department of Justice received notice under CAFA of the eventual settlement wherein Bank of America, N.A. changed its reporting policy, the IRS chose not to involve itself in that litigation.

21.    Plaintiff first noticed the discrepancy in SPSI's interest reporting in late 2013.  She complained to SPSI in or about April 2014 telling it that it had not properly calculated her mortgage interest for tax years 2011 and 2012.  SPSI wrote back in May of 2014 stating it would look into the matter.  Then, in or about mid-May, Plaintiff was contacted by phone and told that SPSI was rejecting Plaintiff's complaint and would not be changing its Form 1098 reporting policy.

22.    Plaintiff alleges on information and belief that the reason SPSI is wrongfully reporting plaintiff's interest payments and those of other class members is for its own financial benefit.  It is alleged that SPSI knowingly started to purchase the servicing rights to Option Arm Mortgages that had a separately reportable income component to the seller (i.e. the unpaid deferred interest) which would be reportable by the seller as income, with the intent to convert it into an asset note only such that there was no separately reportable income component.

23.    Through its purchase SPSI effectively transformed interest to principal without notice to borrowers and in direct violation of IRS regulations, and for its own pecuniary benefit – and/or the benefit of the other party to the servicing contract – and to the direct harm and detriment of the borrowers.

24.    Because SPSI only took over Plaintiff's loan in 2011, Plaintiff is currently unaware of how long (how many tax-years) SPSI has been misreporting mortgage interest.  Plaintiff is also unaware of how many individual Forms 1098 issued by SPSI have been issued using this incorrect method of calculation.  Plaintiff, however, alleges on information and belief that the number of class members in the same situation as Plaintiff is well over 10,000 and may be more than 100,000.

25.    Plaintiff further alleges that some persons whose loans are being serviced by SPSI and which are not negative amortization loans may have gone through loan

**FIRST AMENDED CLASS ACTION COMPLAINT**

modifications where previously deferred interest was consolidated with principal into a "new principal balance" and that payments by those borrowers on the "new principal balance" were, for Form 1098 purposes, treated as though the "new principal balance" did not include interest that had been deferred prior to the loan modification.  Persons in this situation would also be class members here as the identical wrong – failure to properly account for payments of previously deferred interest on Forms 1098 – was practiced against them as well.

**C.    Plaintiff Has Been Harmed By SPSI's Wrongful Conduct**

26.    Plaintiff has been damaged by SPSI's wrongful interest reporting in several ways.  First, as shown above, the amount of interest that Plaintiff actually paid to SPSI in 2011 and 2012 is greater than the amount of interest that was reported by SPSI.  As a result, Plaintiff has not been able to correctly state her taxes or obtain the full mortgage interest deduction she is entitled to under 26 U.S.C. Section 163(a).  She has also suffered the loss of interest on the additional deduction she would have received had the correct amount of interest been reported by SPSI.

27.    Since SPSI refused to provide a correct Form 1098 to Plaintiff for tax-years 2011-2012 when requested to do so, she had no other recourse -- other than to retain counsel and commence this action -- to force SPSI to issue her corrected Forms 1098 for those tax-years or to have SPSI issue proper Forms 1098 in all future years that reflect the actual amount of mortgage interest paid by Plaintiff in those years. The same is true for all Class Members.

28.    Plaintiff and Class Members have suffered damages consisting of, at least: (1) the accountancy fees that will be necessary to prepare and file amended tax returns (where such returns can still be filed) after SPSI issues corrected Form 1098s accurately accounting for the amounts of mortgage interest paid during those years, (2) for all years in which the statute of limitations for amending tax returns may have expired, the differential between the value of the Class Members' mortgage interest deductions (both state and federal) when taken and what the value of the deduction

would have been if the correct amount of mortgage interest had been reported timely by SPSI (plus interest); (3) for all years in which the statute of limitations for amending tax returns may have expired, the accountancy fees necessary to determine the difference in value of the deduction when taken and what it should have been if SPSI had reported the correct amount timely.  (All of this relief can properly be awarded on equitable grounds as well.)

29.     Thus, Plaintiff, on behalf of herself and the Class Members, seeks injunctive and equitable relief and damages as alleged above from SPSI for intentionally and/or negligently under-reporting to them and to the IRS the "mortgage interest" payments they have made.  She also seeks declaratory relief asking the Court to declare that SPSI's accounting and reporting practices are wrongful and that SPSI be required to issue corrected Form 1098s to Plaintiff, Class Members and the IRS for all tax years where SPSI wrongfully reported mortgage interest payments.

# IV.
## THE PARTIES

30.     Plaintiff is an individual who, during all times relevant herein, resided in Rocklin, Placer County, California.  Plaintiff has a mortgage loan owned and/or serviced by SPSI.  SPSI received more than $600 in mortgage interest in both tax-years 2011 and 2012 from Plaintiff, but did not issue Plaintiff an IRS Form 1098 correctly reporting all of the interest it received from Plaintiff because of SPSI's wrongful accounting practice previously described.

31.     Class Members reside in and are located throughout the United States and in foreign jurisdictions.  Each Class Member either owns a main home, second home, residential rental home, or combinations thereof in the United States, or in one of its possessions or territories, with an SPSI-owned or serviced loan and paid previously deferred interest to SPSI which SPSI failed to include in the Class Member's Form 1098 for the year when the payment was made.

**FIRST AMENDED CLASS ACTION COMPLAINT**

32.     SPSI is, and at all times mentioned herein was, a Utah corporation and is, according to its website "a nationally recognized leader in the residential mortgage servicing business." The website also discloses that "[t]he company specializes in the servicing of single-family residential mortgage loans, and has been in business since 1989 with operations in Salt Lake City, Utah and Jacksonville, Florida." Finally, the website claims that SPS is committed to excellent customer service and servicing best practices while continually adding value to clients and investors.one of the nation's leading mortgage servicers." It is headquartered in Salt Lake City, Utah.

# V.

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,[3] 2201, 2202. Subject matter jurisdiction also exists under the Class Action Fairness Act of 2005 -- 28 U.S.C. §§ 1332(a) and 1332(d) -- because the matter in controversy exceeds $5.0 million exclusive of interest and costs and the Named Plaintiff is a citizen of California and SPSI is not. Further, Class Members reside, on information and belief, in every state in America. There is therefore minimal diversity between the Class Members and the Defendant. Further, more than two-thirds of the members of the putative Class Members are citizens of states different from that of the Defendant and this case does not present a local controversy.

34.     This Court has personal jurisdiction over SPSI because, among other things, SPSI does business in the State of California and in this Judicial District, and because SPSI has established minimum contacts with California such that the exercise

---

[3] Plaintiff asserts federal question jurisdiction exists based on her contention that a good faith argument supports the finding that an implied private right of action exists under 26 U.S.C. Section 6050H as that Section was enacted as part of the Taxpayer's Bill of Rights II. See, e.g. *Doane v. Metal Bluing Products, Inc.*, 568 F.Supp. 744, 745-746 (D.C.N.Y. 1983) (where a good faith argument can be made that a federal statute provides for an implied right of action, then federal question jurisdiction exists).

of jurisdiction over it will not offend traditional notions of fair play and substantial justice. Indeed, SPSI has voluntarily conducted business and solicited customers in the State of California for its loans, including in this judicial district and continues to commit the wrongful acts alleged herein against California residents within this judicial district.

35. Venue is proper in this judicial district under 18 U.S.C. §1391 and 1965. SPSI can be found in, has one or more agents in, and/or transacts or has transacted business in this judicial district.

# VI.
## CLASS ALLEGATIONS

36. Paragraphs 1 through 35 above are incorporated herein by reference.

37. Plaintiff brings this action on her own behalf and on behalf of the classes of persons similarly situated to her pursuant to Rule 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

38. Plaintiff seeks to represent a damage class of:

> All persons who made payments of mortgage interest over $600 to SPSI on loans secured by real property in the United States (or in its territories and protectorates) during any calendar year and where SPSI (and/or the party holding the note) did not report to the person on Form 1098 the full amount of the mortgage interest that it received from the person during the calendar year for which the Form 1098 was issued.

Plaintiff also seeks to represent an injunctive class consisting of:

> All persons who made payments of mortgage interest over $600 to SPSI on loans secured by real property in the United States (or in its territories and protectorates) during any calendar year and where SPSI (and/or the party holding the note) did not report to the person on

-13-

1    Form 1098 the full amount of the mortgage interest that it received

2    from the person during the calendar year for which the Form 1098

3    was issued.

4    Plaintiff reserve the right to amend the definition of these classes, or to amend their

5    complaint to state appropriate sub-classes following discovery.

6    39.    Plaintiff does not know the exact size of the classes or the identities of

7    the Class Members since such information is in the exclusive control of SPSI.  She

8    believes, however, that the classes encompass as many as tens of thousands of

9    individuals who are geographically dispersed throughout the United States and in

10   foreign nations.  The number of members in the classes are certainly so numerous that

11   joinder of all Class Members is impracticable.

12   40.    There are numerous questions of law and fact common to the classes that

13   will predominate over any questions affecting only individuals.   Among these

14   common questions are:

15   a.    Whether "deferred interest" paid by Class Members to SPSI is

16   "mortgage interest" that should have been reported in the year in

17   which it was paid;

18   b.    Whether SPSI had the right to unilaterally, and without notice to its

19   borrowers, (or to the IRS), fail to report mortgage interest in the

20   year in which it is paid;

21   c.    Whether SPSI maintains written and/or unwritten policies,

22   procedures and/or practices concerning the accounting and

23   reporting of mortgage interest payments received by SPSI from

24   Class Members, and whether those policies have changed over

25   time;

26   d.    Whether SPSI acted intentionally in committing its wrongs against

27   the Class Members;

28

-14-

**FIRST AMENDED CLASS ACTION COMPLAINT**

e.     Whether SPSI's disclosures to consumers were adequate as to how it would treat payments of deferred mortgage interest;

f.     What injunctive relief would be appropriate to prevent further wrongful conduct by SPSI;

g.     What remedial measures would be appropriate to remedy the wrongs that have been done by SPSI to the Class; and

h.     Whether punitive damages should be awarded against SPSI.

41.     The claims of the Plaintiff are typical of the claims of the classes and do not conflict with the interests of any other Class Members in that both the Plaintiff and the other Class Members were subjected to the same wrongful policies, practices and procedures of SPSI and all have an interest (and legal duty) to assure that their taxes are properly stated.

42.     The Plaintiff will fairly and adequately represent the interests of the other Class Members.   The Plaintiff has retained skilled and experienced counsel to represent the classes in this class action litigation.

43.     Prosecution of separate actions will create the risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of Class Members who are not parties to those adjudications and would/could substantially impair or impede their ability to protect their interests.

44.     In adopting and implementing the policies, practices and procedures hereinafter alleged, SPSI has acted, failed, or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

45.     The class action is superior to other available methods for fairly and efficiently adjudicating the issues concerning whether SPSI's policies, practices and procedures in accounting for and reporting the payment of "deferred mortgage interest" received by SPSI have class-wide impact and effect are in violation of IRS requirements.

FIRST AMENDED CLASS ACTION COMPLAINT

## COUNT I

## BREACH OF CONTRACT

46.     Plaintiff re-alleges and hereby incorporate each and every allegation contained in Paragraphs 1 through 45 of this Complaint as though fully set forth herein.

47.     With the origination of each of the loans it services, the original lender provided Plaintiff and Class Members with promissory notes.

48.     Although these notes do not contain any provision specifically governing the manner in which the lender would report mortgage interest to Plaintiff and Class Members, doing so is nonetheless a term of each such contract because the lender had a legal duty to provide accurate Forms 1098 as required by 26 U.S.C. § 6050H.  This contractual term is also material to borrowers because of the tax deductibility of mortgage interest and so they can carry out their legal obligation to file their taxes accurately.

49.     When Plaintiff's loan was sold by the original issuer, the acquiring entity succeeded to all of the rights and obligations imposed by the original loan contract. When SPSI acquired the servicing rights to Plaintiff's loan from whichever entity in fact owns Plaintiff's mortgage, SPSI assumed the role of acting as the agent of the owner of the note and thus was bound by the note's terms.  Alternatively, Plaintiff and the Class Members were intended third party beneficiaries of the contract between the owner of Plaintiff's mortgage and SPSI since the very thing that SPSI was contracting to do was, *inter alia*, to provide loan servicing to Plaintiff and Class Members, including providing them Forms 1098.  Plaintiff is not in possession of this contract, but alleges that it generally provides that SPSI, in return for compensation, would collect payments from borrowers and perform all duties associated with servicing loans such as fielding consumer questions and reporting on interest payments.  Thus, it was reasonably foreseeable to SPSI that it could/would be held responsible in contract to persons in Plaintiff's situation for any mistakes that SPSI made in issuing

those Form 1098s.  SPSI has continually breached this contract from at least 2011 forward to the present by failing to accurately report interest payments "received" by it as required by § 6050H and the definition of interest under 26 U.S.C. § 163(a).

50.    Plaintiff is not in default on her loan and has complied with all terms and conditions of her contract.  But even as to Class Members who might have defaulted, SPSI's obligation to provide Forms 1098 is an independent duty arising from their contract by virtue of Section 6050H and the fact that it received the interest.

51.    As a result of SPSI's breach of the contracts alleged herein, Plaintiff and the Class Members have been damaged as set forth above.

## COUNT II

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

52.    Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53.    In every contract, parties have a duty to act in good faith and deal with each other fairly.  By virtue of both the loan agreements and servicing agreements, SPSI had such a duty to act in good faith with respect to Plaintiff and the Class Members.  This included the duty to not to conceal and/or fully and unambiguously disclose to Plaintiff and Class Members that the way it was treating "deferred interest" payments was against Class Members' interests and contrary to established tax law.

54.    After receiving Plaintiff's and the Class Members' mortgage interest payments, SPSI breached the implied covenant of good faith and fair dealing by failing to report payments of "deferred interest" it received from Plaintiff and Class Members consistent with established tax law and IRS regulations.  This inaccurate reporting caused Class Members to receive inaccurate Form 1098s thereby depriving them of significant tax deductions.  Further, when Plaintiff notified SPSI of its failure to accurately report their interest payments, SPSI had an obligation under RESPA and

**FIRST AMENDED CLASS ACTION COMPLAINT**

the covenant of good faith to research their contention fully. Had it done so, it would have determined that its policy was wrong. Thus, to the extent SPSI did not, upon receipt of Plaintiff's complaint, reverse its course and issue revised Forms 1098 for all years in which it issued inaccurate Forms 1098, such was a further breach of the covenant of good faith and fair dealing.

55. As a result of SPSI's breaches of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged as set forth above and will be damaged in the future to the extent that they are precluded by the statute of limitations from amending any of their affected tax returns.

56. It is further alleged that SPSI acted intentionally and with knowledge that its reporting policies were in violation of law and took its actions notwithstanding that knowledge so as to maximize its own profits and avoid conflict with its borrowers and the IRS.

57. SPSI committed its wrongful acts intentionally and with knowledge of the harm it was doing to consumers and in a manner shocking to the conscience so punitive damages should be assessed against SPSI.

## COUNT III

### UNFAIR/DECEPTIVE BUSINESS PRACTICES

58. Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 57 of this Complaint as though fully set forth herein.

59. California Business & Professions Code § 17200 et seq. ("UCL") prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

60. As alleged above, SPSI has been violating the terms of 26 U.S.C. § 6050H by failing to include payments of mortgage interest that were actually "received" by it from Plaintiff and Class Members. SPSI's practice constitutes an

unlawful, unfair and fraudulent business practices under the UCL and would also constitute violations of similar consumer protection laws applicable in individual states throughout the United States.

61.   However, in the event that the Court determines that the UCL either cannot be applied in these circumstances outside of California, or that the differences between the laws of the several states and California's UCL are so substantial as to make the administration of a class action unmanageable, then Plaintiff asserts that a separate subclass of California borrowers should be certified for all of Plaintiff's claims, including Plaintiff's UCL claim.  This sub-class would be defined in the same manner as the main class, but would be limited to Class Members with loans secured by real property in California.

62.   Plaintiff has suffered losses of money or property as a result of Defendant's unlawful, deceptive and unfair business practices and will incur future losses as a result of having to amend her tax returns.  As a result of Defendant's violations of the UCL, Plaintiff and Class Members are entitled to bring this claim for injunctive and other equitable relief.  And, as a part of that relief, Plaintiff requests the Court act in equity to order SPSI to issue corrected Forms 1098 and payment of accountancy fees, attorneys' fees and costs Plaintiff and the members of the class will have to incur to correct SPSI's wrongful prior reporting.

## COUNT IV
## DECLARATORY RELIEF

63.   Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 62 of this Complaint as though fully set forth herein.

64.   An actual controversy has arisen and now exists between Plaintiff and SPSI regarding the manner in which SPSI accounts for payments of "deferred interest" as alleged above.

FIRST AMENDED CLASS ACTION COMPLAINT

65.    Plaintiff and Class Members contend that SPSI has maintained a policy whereby it has wrongfully under-reported to the IRS and Class Members the amount of "mortgage interest" paid by them and has refused to correct these errors.

66.    SPSI denies this contention and refuses to change its policy.

67.    A declaratory judgment is necessary to immediately resolve the issue as to whether SPSI is correctly reporting Class Members' mortgage interest payments on Form 1098s and whether SPSI should be required to provide corrected 1098 forms to the Class Members for all years in which its policies did not conform to law.

68.    Without such a declaratory judgment, Plaintiff and the Class Members will have no way of complying with their legal obligation of properly reporting their payments of mortgage interest to the IRS in their tax returns and cannot correct previous errors caused by SPSI.

69.    Wherefore, declaratory relief is necessary and proper in this matter.

## COUNT V

### PRELIMINARY AND PERMANENT INJUNCTION

70.    Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71.    Plaintiff is informed and believes, and thereon alleges, that Defendant's wrongful actions and omissions as alleged above, if permitted to continue and occur, will cause great and irreparable harm to Plaintiff and Class Members, including the inability to properly file their tax returns for all future tax/calendar years, which is their legal obligation.   Many of the loans on which SPSI is wrongfully reporting mortgage interest have a term of 20 years or more.

72.    Wherefore, Plaintiff, on behalf of herself and all Class Members seeks: 1) to enjoin SPSI from issuing any IRS Form 1098s that do not account for its receipt of "deferred interest" received from Plaintiff and Class Members, 2) that SPSI be

**FIRST AMENDED CLASS ACTION COMPLAINT**

compelled to issue corrected 1098 forms to all Class Members for all years in which it has done so wrongfully and for which the statute of limitations has not expires, thereby permitting Class Members to file amended tax returns, and 3) that as part of its equitable powers, the Court order SPSI to pay for the accounting fees necessary for all Class Members to amend their tax returns to correct SPSI's error.

## COUNT VI

## FRAUD

73.     Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 72 of this Complaint as though fully set forth herein.

74.     As alleged previously, SPSI knowingly and intentionally misrepresented the correct amount of interest that Plaintiff paid to it in 2011 and 2012.   It also intentionally concealed from Plaintiff and the other Class Members that it had wrongfully reported incorrect amounts of mortgage interest on the Forms 1098 that it had issued and for the sole purpose of benefitting SPSI.

75.     SPSI was under a legal duty pursuant to 26 U.S.C. §6050H to report accurately the interest SPSI "received" during each calendar year.   It was further under a duty to correct any mistakes on Forms 1098 as soon as possible after determining that a wrong amount had been reported.

76.     SPSI imposed its policy of not reporting all interest received from borrowers, and concealed this policy from its borrowers, in order for SPSI to receive a substantial financial windfall in not having to report as interest income to SPSI the "deferred interest" received from its borrowers.   SPSI cleverly calculated deferred interest on the loans it acquired as capital.   But in order to benefit SPSI, SPSI had to deny borrowers the proper and permissible tax benefit of having deferred interest paid reported on Form 1098 so all borrowers could use the full amount of interest paid as a tax deduction. SPSI was under a legal duty pursuant to 26 U.S.C. § 6050H to report

**FIRST AMENDED CLASS ACTION COMPLAINT**

accurately only the interest SPSI "received" during each calendar year and it was further under a duty to correct any mistakes on Forms 1098 as soon as possible after determining that a wrong amount had been reported.

77.    SPSI knew that its concealment of the facts relating to its wrongful interest reporting would be relied upon by Plaintiffs and the Class Members (and the IRS). Borrowers and the IRS historically rely on the 1098 Forms received from the person preparing the form.  Additionally, it is quite easy for SPSI to point to language in any loan document that states any unpaid interest will be added to the principal. However, what SPSI conceals and does not tell borrowers that regardless of this contractual wordsmithing, the character of the "amount added to the principal;" is not changed from unpaid interest to principal.  Plaintiffs' and class members' reliance on the Forms 1098 as filed, as well as SPSI's explanations' was clearly reasonable.

78.    Plaintiffs and the Class Members did not (and Class Members still do not) know about SPSI's improper and illegal scheme, and, even if some tiny percentage may have figured it out, like Plaintiffs, they were still powerless to avoid being damaged by SPSI's fraud because of the IRS' aforementioned policy of rejecting any returns where the amount of interest claimed did not match the amount of the lender/servicer-issued Form 1098. Each and every time SPSI delivered to a class member an incorrect Form 1098, it acted in accordance with its well devised scheme and plan to benefit itself at the expense of its borrowers.

79.    SPSI knew and intended that Plaintiff' and the Class Members' reliance on the incorrect Forms 1098 would cause detriment to the Plaintiffs and the Class Members, but pursued its policy with callous disregard to the injuries it would cause. In fact, SPSI measured, calculated and knew that regardless of the damage to the Class Members, the benefit to SPSI was tremendous, and it was worth the risk to hide, conceal and defraud its borrowers.

**FIRST AMENDED CLASS ACTION COMPLAINT**

80.     As a direct and proximate result of SPSI's multiple concealments, Plaintiffs and the Class Members have been damaged in an amount according to proof.

81.     For all the reasons stated above, it is undisputable that SPSI's fraudulent concealment was undertaken with a conscious disregard of its effect on Plaintiffs and the Class Members, for its own benefit without regard to the tremendous financial harm to Plaintiffs and class members, and as will be shown at trial, to the great financial benefit of a towering financial giant that has a significant impact on the financial lives of average people in the home loan market place.  This outrageous and knowingly fraudulent and harmful conduct shocks the conscience and rises to the level of malicious and oppressive conduct for which punitive damages should be awarded.  This is a known and intentional pattern and practice of conduct affecting tens of thousands of people which has reap huge financial benefits for SPSI.

## COUNT VII

## NEGLIGENCE

82.     Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 81 of this Complaint as though fully set forth herein.

83.     As alleged previously, SPSI was under a legal duty pursuant to 26 U.S.C. § 6050H to report accurately only the interest SPSI "received" during each calendar year.  It was further under a duty to correct any mistakes on Forms 1098 as soon as possible after determining that a wrong amount had been reported.

84.     Assuming that SPSI did not intentionally report incorrect amounts of mortgage interest on the Forms 1098 that it sent to Plaintiff and Class Members, it negligently breached its legal duty to Plaintiff and the Class Members to accurately report the amounts of mortgage interest to Plaintiff and the Class Members.

FIRST AMENDED CLASS ACTION COMPLAINT

85.     If SPSI's reporting of incorrect amounts of mortgage interest paid by Plaintiff and the Class Members was negligent, those amounts constituted negligent misrepresentations of a material fact.   SPSI made those representations without reasonable ground for believing them to be true.   SPSI is a sophisticated financial entity, engaging in mortgage lending and servicing.   Section 6050(H) is crystal clear.  SPSI could not have had any reasonable ground to believe its reporting practice is proper.   SPSI made those representations with the knowledge and intent that Plaintiff and Class Members would rely upon the amounts contained in the Form 1098 for their tax returns.   Plaintiff and class members' reliance on the amounts stated in the Forms 1098 issued to them by SPSI is justifiable because SPSI was under a legal duty to correctly calculate those amounts; and Plaintiff and class members suffered resulting damage from SPSI's misrepresentations.

86.     Damage to Plaintiff and Class Members was reasonably foreseeable to SPSI since it knows borrowers rely on Forms 1098 for tax deductions.   As a result of SPSI's negligence Plaintiff and the Class Members have been damaged in an amount according to proof.   Plaintiff and Class Members did not know about SPSI's improper and illegal reporting, and, even if some tiny percentage may have figured it out, they were still powerless to avoid being damaged by SPSI's negligence because of the IRS' aforementioned policy of rejecting any returns where the amount of interest claimed did not match the amount of the lender/servicer-issued Form 1098.

87.     As a direct and proximate result of SPSI's negligent reporting, Plaintiff and the Class Members have been damaged in an amount according to proof.

## COUNT VIII

### VIOLATION OF 26 U.S.C. 6050H

88.     Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 87 of this Complaint as though fully set forth herein.

89.     Plaintiff asserts that there exists an implied private right of action to enforce the terms of 26 U.S.C. § 6050H under the test established in *Cort v. Ash*, 422 U.S. 66, 78 (1975).  To the extent an implied private right of action is found to exist on behalf of a borrower to enforce the terms of 26 U.S.C. § 6050H, Plaintiff alleges as follows:

90.     SPSI had a duty to accurately report to the IRS the amount of mortgage interest Plaintiff and Class Members paid to it under 26 U.S.C. § 6050H.   SPSI breached this duty by failing to report payments of deferred interest on the Form 1098s it issued to its borrowers, including Plaintiff and the Class Members.

91.     As a proximate result of SPSI's breach of its statutory duty as herein alleged, Plaintiff and Class Members have been harmed by receiving inaccurate Form 1098s and have suffered damages as a result thereof as specified above.  Further, Plaintiff and the Class Members have been deprived of the ability to accurately report to the IRS the full amount of their mortgage interest deduction and are entitled to equitable relief to remedy their situation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and all Class Members, prays for judgment and injunctive and equitable relief against SPSI as follows:

(a)     Certification of the classes pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as the representative of the classes (and for the California sub-class (if necessary)), and designating Plaintiff's counsel as counsel for the class (and subclass if necessary);

(b)     A judicial declaration that SPSI has committed the violations alleged herein;

**FIRST AMENDED CLASS ACTION COMPLAINT**

(c)  An Order requiring SPSI to issue corrected Form 1098s to Plaintiff and to all Class Members for all years where SPSI did not report the correct amount of mortgage interest paid to it on such forms;

(d)  For general and special damages in an amount to be proven at time of trial, including, but not limited to, accountancy fees necessary to amend Class Member tax returns (state and federal) and/or to determine the value of any lost deductions, and the value of those lost deductions;

(e)  For punitive or exemplary damages on all causes of action where appropriate;

(f)  An Order in equity (if no damages are awarded) requiring Defendant to pay for the Class Members' reasonable expenses in filing amended tax returns for those years where SPSI did not report the correct amount of mortgage interest on each Class Members' IRS Form 1098s;

(g)  An order in equity (if no damages are awarded) requiring Defendant to pay any accountancy expenses necessary to determining if they lost money as a result of SPSI's mis-reporting of mortgage interest on their Forms 1098;

(h)  An Order precluding SPSI from issuing any Form 1098s which do not accurately reflect the interest paid to it during any given year;

(i)  Prejudgment interest at the legal rate on any sum of damages awarded;

(j)  Attorney's fees according to proof at time of trial;

(k)  Costs of suit, including expert witness fees and costs, herein incurred;

(l)  For such other and further relief as this Court may deem proper and just; and

///
///
///

**FIRST AMENDED CLASS ACTION COMPLAINT**

# JURY TRIAL DEMAND

Plaintiff and all those similarly situated hereby demand a trial by jury for all issues so triable and if any arbitration clause is asserted by Defendant, on the issue of whether a valid arbitration agreement exists.

Date: April 26, 2017                    MORRIS POLICH & PURDY LLP


By: _____ *s/ David J. Vendler* _____
      David J. Vendler
      E-mail: dvendler@mpplaw.com

MICHAEL R. BROWN, APC
Michael R. Brown, Esq. (SBN 65324)
Email:   mbrown@mrbapclaw.com
18101 Von Karman Avenue, Suite 1900
Irvine, California 92612
Tel.:   (949) 435-3888
Fax:   (949) 435 3801

Attorneys for Plaintiff ADRIANA ROVAI and all others similarly situated

-27-

# TABLE OF CONTENTS

**Page**

Exhibit A ................................................................................................ 1

Exhibit B ............................................................................................... 34

Exhibit C ............................................................................................... 36

Exhibit D ............................................................................................... 37

Exhibit E ............................................................................................... 39

Exhibit F ............................................................................................... 40

# Exhibit "A"



ALLIANCE TITLE COMPANY
hereby certifies this is a true
and correct copy of the original
_Kristen Larch_

Recording Requested By:
FIRST MAGNUS FINANCIAL CORPORATION

Return To:
FIRST MAGNUS FINANCIAL CORPORATION

803 N. WILMOT
TUCSON, AZ 85711

Prepared By:
FIRST MAGNUS FINANCIAL CORPORATION
803 N. WILMOT
TUCSON, AZ 85711

12384239-908-DH

[Space Above This Line For Recording Data]

# DEED OF TRUST

LOAN NO.: 6975002382
ESCROW NO.: 12384239-808

MIN  100034289750023626
MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated          NOVEMBER 10, 2005          ,
together with all Riders to this document.
(B) "Borrower" is
ADRIANA ROVAI, A MARRIED WOMAN, AS HER SOLE AND SEPARATE PROPERTY

Borrower's address is 5049 MIDAS AVENUE, ROCKLIN, CA  95677
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

Lender is a  CORPORATION
organized and existing under the laws of  ARIZONA

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005  1/01
VMP-6A(CA) (0207)                          Page 1 of 16        LENDER SUPPORT SYSTEMS, INC MERS6ACA.NEW (05/04)

Lender's address is
603 North Wilmot Road, Tucson, AZ 85711
(D) "Trustee" is
ALLIANCE TITLE
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated        NOVEMBER 10, 2005
The Note states that Borrower owes Lender
FIVE HUNDRED TWENTY FOUR THOUSAND AND NO/100 X X X X X X X X X X X X X X X X X X X X
                                                                                          Dollars
(U.S. $ 524,000.00         ✓ ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     DECEMBER 01, 2035                    .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "RIDERS" means all riders to this Security Instrument that are executed by Borrower. The following
riders are to be executed by Borrower (check box as applicable):

| | | |
|---|---|---|
| ✓ [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials _____

VMP-6A(CA) (0207)                        Page 2 of 15                        Form 3005   1/01

12384239 -808 -DH1

**Exhibit A**
**Legal Description**

All that certain real property in the City of Rocklin, County of Placer, State of California, described
as follows:

Lot 23, as shown on the Map of Rocklin Estates Unit No. 2, filed August 31, 1987, in Book "P" of
Maps, Page 29, Placer County Records.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                       of                              PLACER                       :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF......AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 370-090-011-000                                     which currently has the address of
                          5049 MIDAS AVENUE                                              [Street]
                ROCKLIN                         [City] , California      95677      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

Initials: A.P.

VMP-6A(CA) (0207)                              Page 3 of 15                              Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Amended Complaint, Exh A-005

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

VMP-6A(CA) (0207)                        Page 6 of 15                          Initials: _____
                                                                             Form 3005  1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

VMP-6A(CA) (0207)                          Page 9 of 15                          Initials: ___
Form 3005  1/01

Amended Complaint, Exh A-010

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Amended Complaint, Exh A-011

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

VMP-6A(CA) (0207)                    Page 11 of 15                    Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

VMP-6A(CA) (0207)                    Page 12 of 15                    Initials: _PC_
                                                                     Form 3005  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

VMP-6A(CA) (0207)                    Page 13 of 15                    Initials: AR
                                                                      Form 3005  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any RIDER executed by Borrower and recorded with it.

Witnesses:

_____
-Witness

_____
-Witness

_____ (Seal)
ADRIANA ROVAI                    -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

VMP-6A(CA) (0207)          Page 14 of 16          Form 3005  1/01

: PREPAYMENT PENALTY ADDENDUM TO NOTE' ATTACHED HERETO AND MADE A PART HEREOF.

LOAN NO.: 8975002382

MIN: 100039289750023628
MERS Phone: 1-888-679-6377

## ADJUSTABLE RATE NOTE
### (MTA - Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE *THE INTEREST RATE AND THE* MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

NOVEMBER 10, 2006
[Date]

SACRAMENTO
[City]

5049 MIDAS AVENUE, ROCKLIN, CA 9567
[Property Address]

ALLIANCE TITLE COMPANY
hereby certifies this is a true
and correct copy of the original

*Kristen Lerch*

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $      524,000.00      (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed   ONE HUNDRED FIFTEEN AND 000/1000THS   percent (115.000 %) of the Principal amount I originally borrowed.  This is called the "Maximum Limit."  Lender is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

(A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      1.500      %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B) Interest Rate Change Dates

The interest rate I will pay may change on the      1st      day of      JANUARY, 2006      , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   THREE AND 025/1000THS   percentage point(s) (      3.025      %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  This rounded amount will be my new interest rate until the next Interest Rate Change Date.  My interest will never be greater than   9.950   %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

PayOption ARM Note - MTA Index - Multistate
FE-5312 (0412)

Page 1 of 5

LENDER SUPPORT SYSTEMS INC. FE5312XX.CGU (01/06)

10/04

3.   PAYMENTS
    (A) Time and Place of Payments
    I will make a payment every month.
    I will make my monthly payments on the    1st    day of each month beginning on    JANUARY, 2006
I will make these payments every month until I have paid all the Principal and interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied
to interest before Principal. If, on    DECEMBER 01, 2035    , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."

    I will make my monthly payments at    First Magnus Financial Corporation, An Arizona Corporation
603 North Wilmot Road, Tucson, AZ  85711
or at a different place if required by the Note Holder.

    (B) Amount of My Initial Monthly Payments
    Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $    1,808.43
unless adjusted under Section 3 (F).

    (C) Payment Change Dates
    My monthly payment may change as required by Section 3(D) below beginning on the first day of    JANUARY, 2007    ,
and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment
also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum
Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment
Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of
the interest due then negative amortization will occur.
    I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided
in Section 3(F) or 3(G) below.

    (D) Calculation of Monthly Payment Changes
    At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that
would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity
date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The
result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly
payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5%
limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply
to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by
taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me
to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also
have the option to pay the Full Payment for my monthly payment.

    (E) Additions to My Unpaid Principal
    Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject
to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of
the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment
date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the
interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and
will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate
required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply
the payment as provided in Section 3(A).

    (F) Limit on My Unpaid Principal; Increased Monthly Payment
    My unpaid Principal can never exceed the Maximum Limit equal to    ONE HUNDRED FIFTEEN  AND 000/1000THS    percent
( 115.000 %) of the Principal amount I originally borrowed. My unpaid principal could exceed that Maximum Limit due to

PayOption ARM Note - MTA Index - Multistate                                                          Initials: _____
FE-S312 (0412)                                Page 2 of 5                                             10/04

Minimum Payments and interest rate increases.  In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment.  This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap.  The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G) Required Full Payment
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again.  I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(H) Payment Options
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options."  I may be given the following Payment Options:
    (i)    Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate.  The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
    (ii)    Fully Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
    (iii)    15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments.  This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

4.    NOTICE OF CHANGES
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.    BORROWER'S RIGHT TO PREPAY
I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
I may make a full Prepayment or partial Prepayments without paying any Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments.  My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.    LOAN CHARGES
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.    BORROWER'S FAILURE TO PAY AS REQUIRED
(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of    FIFTEEN  ( 16 ) calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 5.000    % of my overdue payment of Principal and Interest.  I will pay this late charge promptly but only once on each late payment.

PayOption ARM Note - MTA Index - Multistate
FE-5312 (0412)    Page 3 of 5    Initials: _____
10/04

Amended Complaint, Exh A-018

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8.   GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

10.   WAIVERS
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.   SECURED NOTE
In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option

PayOption ARM Note - MTA Index - Multistate
FE-5312 (0412)                              Page 4 of 5

Initials: _____
10/04

shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
ADRIANA ROVAI                     -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                        -Borrower

PayOption ARM Note - MTA Index - Multistate
FE-5312 (0412)                     Page 6 of 6                                    10/04

11/10/2005 15:22 FAX                                                                @002/006

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

| Mortgage Applied for: | ☐ V.A. ☒ Conventional ☐ Other: | Agency Case Number | Lender Case Number |
| | ☐ FHA ☐ USDA/Rural Housing Service | | ROVAI |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☐ Fixed Rate ☐ GPM | ☐ Other (explain): |
| $ 524,000.00 | 6.188 % | 360 | | ☒ ARM (type): |

**Subject Property Address (street, city, state, ZIP)**
5049 Midas Ave., Rocklin, CA 95677                                         No. of Units

**Legal Description of Subject Property (attach description if necessary)**   Property County: placer      Year Built
See pre-lim

| Purpose of Loan | ☐ Purchase ☐ Construction ☐ Other (explain): | Property will be: |
| | ☒ Refinance ☐ Construction-Permanent | ☒ Primary Residence ☐ Secondary Residence ☐ Investment |

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
| | $ | $ | $ | $ | $ |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
| 1998 | $ 325,000 | $ | | Cost: $ |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
| Adrianna Rovai | married sole and seperate | ☒ Fee Simple ☐ Leasehold (show expiration date) |

**Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)**

## III. BORROWER INFORMATION

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
| Adrianna Rovai | |

| Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
| | (916) 632-7289 | | 16 | | | | |

| ☒ Married ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no. ages | ☐ Married ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Borrower) no. ages |
| ☐ Separated | | ☐ Separated | |

| Present Address (street, city, state, ZIP) ☒ Own ☐ Rent _8_ No. Yrs. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
| 5049 Midas Ave. | |
| Rocklin, CA 95677 | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |

## IV. EMPLOYMENT INFORMATION

| Name & Address of Employer | ☐ Self Employed | Yrs. on this job | Name & Address of Employer | ☐ Self Employed | Yrs. on this job |
| Access Capital Inc. | | 2 | | | |
| 1451 River Park Drive #120 | | Yrs. employed in this line of work/profession | | | Yrs. employed in this line of work/profession |
| Sacramento, CA 95815 | | 16 | | | |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Vice President | (916) 614-1850 | | |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
| | | | | | |
| | | Monthly Income | | | Monthly Income |
| | | $ | | | $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from-to) | Name & Address of Employer | ☐ Self Employed | Dates (from-to) |
| | | | | | |
| | | Monthly Income | | | Monthly Income |
| | | $ | | | $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04        Initials AR        Initials ____

Page 1 of 4

form by ProLine Solutions (800) 787-6643 / FA036411 / 10-3003

#8

11/10/2005 15:22 FAX                                                                                      @003/008

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 15,000.00 | $ | $ 15,000.00 | Rent | | |
| Overtime | | | | First Mortgage (P&I) | 1,742.00 | 1,808.43 |
| Bonuses | | | | Other Financing (P&I) | 1,313.00 | |
| Commissions | | | | Hazard Insurance | 80.00 | |
| Dividends/Interest | | | | Real Estate Taxes | 300.00 | |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other | | | | Homeowner Assn. Dues | | |
| Total | 15,000.00 | | 15,000.00 | Total | 3,435.00 | 1,808.43 |

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit | | WASHINGTON MUTUAL HOME / REO / Acct. 1608459387473 | (1,742.00) | (309,114.59) |
| Wells Fargo / Acct. 050-6582717 | 3,000.00 | GMAC / INST / Acct. 085900062934 | 784.00 | 18,171.00 |
| Wells Fargo / Charles Swabb / Acct. 050-6581206 | 7,000.00 | Wells Fargo / REO / Acct. 851 2224127 1998 | (600.00) | (100,000.00) |
| Acct. 1661-6224 | 2,023.00 | WELLS FARGO BANK N A / REO / Acct. 9616512224127 | (713.00) | (105,000.00) |
| ** SEE PAGE 4 ** | | CITI / REV / Acct. 641066841054 | 470.00 | 21,696.00 |
| IRA | 26,000.00 | MBNA AMERICA / REV / Acct. 0266 | 330.00 | 20,036.00 |
| Subtotal Liquid Assets | 37,023.00 | ** SEE PAGE 4 ** | 112.00 | 13,561.00 |
| Real estate owned | 655,000.00 | | | |
| Chevy Suburban | 20,000.00 | | | |
| Lexus | 20,000.00 | | | |
| | | Total Monthly Payments | 1,676.00 | |
| Total Assets a. | 732,023.00 | 658,559.00 | Total Liabilities b. | 73,484.00 |

Amended Complaint, Exh A-022

11/10/2005 15:23 FAX

☰005/006

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B or Borrower or C for Co-Borrower. | Borrower: Adrienna Roval | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: ROVAI |

| List Checking and Savings Accounts Below | | |
|---|---|---|
| Name and Address of Bank, S&L, or Credit Union **American River Bank** | | |
| Acct No.   **4100 17728** | | $ |
| Name and Address of Bank, S&L, or Credit Union **American River Bank** | | |
| Acct No. | | $ |

| Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|
| **LIABILITIES** | Monthly Pymt & Mos. Left to Pay | Unpaid Balance |
| Name and Address of Company **BANK OF AMERICA** | $ Payt./Mos. REV 102.00 | $ 13,509.00 |
| Acct No.   **436638001177** | | |
| Name and Address of Company **MACYS/GEMB** | $ Payt./Mos. REV 10.00 | $ 52.00 |
| Acct No.   **67225478** | | |

| I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq. | | | |
|---|---|---|---|
| Borrower's Signature X *ADRIAN Roval* | Date 11-11-05 | Co-Borrower's Signature X | Date |

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

Page 4 of 4
form by Pipeline Soldiers / 800-787-8943 / FAO20414 / 10-2003

Amended Complaint, Exh A-023

11/10/2005 15:23 FAX 004/006

**VII. Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 5049 Midas Ave. Rocklin, CA 95677 | SP / SFR | 655,000 | 514,115 | | 3,055 | | |
| | | | | | | | |
| | | | | | | | |
| Totals | | 655,000 | 514,115 | | 3,055 | | |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor | Account Number |
|---|---|---|

**VIII. Details of Transaction**

| | | **IX. Declarations** |
|---|---|---|

| a. Purchase price | |
|---|---|
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 514,114.59 |
| e. Estimated prepaid items | 1,332.60 |
| f. Estimated closing costs | 2,997.90 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 518,445.09 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 524,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 524,000.00 |
| p. Cash from/to Borrower (subtract j, k, l, & o from i) | (5,554.91) |

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes / No | Co-Borrower Yes / No |
|---|---|---|
| a. Are there any outstanding judgments against you? | No | |
| b. Have you been declared bankrupt within the past 7 years? | No | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | No | |
| d. Are you a party to a lawsuit? | No | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | No | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | No | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | No | |
| h. Is any part of the down payment borrowed? | No | |
| i. Are you a co-maker or endorser on a note? | No | |
| j. Are you a U.S. citizen? | Yes | |
| k. Are you a permanent resident alien? | No | |
| l. Do you intend to occupy the property as your primary residence? | Yes | |
| m. Have you had an ownership interest in a property in the last three years? | Yes | |
| (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | |
| (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | |

**X. Acknowledgement and Agreement**

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct...

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 11-11-05 | X | |

**X. Information for Government Monitoring Purposes**

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws...

| BORROWER | [X] I do not wish to furnish this information | | CO-BORROWER | [X] I do not wish to furnish this information | |
|---|---|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native ☐ Native Hawaiian or Other Pacific Islander | ☐ Asian ☐ White | ☐ Black or African American | Race: | ☐ American Indian or Alaska Native ☐ Native Hawaiian or Other Pacific Islander | ☐ Asian ☐ White | ☐ Black or African American |
| Sex: | ☐ Female | ☐ Male | Sex: | ☐ Female | ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | Mick Schinmel | Keppel Mortgage Group |
| ☐ face-to-face interview | Interviewer's Signature / Date 11/11/05 | 2150 River Plaza Drive Suite 205 |
| [X] by mail | | Sacramento, CA 95833 |
| ☐ by telephone | Interviewer's Phone Number (incl. area code) | (916) 929-3732 Fax |
| ☐ Internet | (916) 929-5626 | www.kmgloan.com |

Page 3 of 4

Form by Pipeline Solutions (800) 787-6612 / FAG20412 / 10-04

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

Amended Complaint, Exh A-024

NOV. 28. 2005 12:50PM    ALLIANCE TITLE                                    P. 1   2002-0205

| A. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | B. TYPE OF LOAN: 3328 |
|---|---|

SETTLEMENT STATEMENT

Alliance Title Company
1455 Response Rd., Ste. 165
Sacramento, CA 95815

LN# 917500236?

FINAL    Attn: Final HUD-1

| 1. ☐ FHA | 2. ☐ FMHA | 3. ■ CONV. UNINS. |
|---|---|---|
| 4. ☐ VA | 5. ☐ CONV. INS. | |

6. ESCROW FILE NUMBER:
12384238-808  DH1

7. LOAN NUMBER:
8975002362

E. MORTGAGE INSURANCE CASE NUMBER:

C. NOTE: This form is furnished to give you a statement of actual settlement costs.  Amounts paid to and by the settlement agent are shown.
Items marked "(P.O.C.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER:      Adrianna Rovai

ADDRESS OF BORROWER:

E. NAME OF SELLER:      Adriana Rovai and Shaun V. Rovai

CERTIFIED TO BE A TRUE
AND CORRECT COPY
Alliance Title Company

By

ADDRESS OF SELLER:

F. NAME OF LENDER:      First Magnus Financial Corporation
ADDRESS OF LENDER:      3013 Douglas Blvd Suite 210,
Roseville, CA 95661

G. PROPERTY LOCATION:      5049 Midas Avenue
Rocklin, CA  95677
Placer 370-090-011-000

H. SETTLEMENT AGENT:      Alliance Title Company
PLACE OF SETTLEMENT:      1455 Response Rd., Ste. 165, Sacramento, CA 95815

| I. SETTLEMENT DATE: 11/18/2005 | PRORATION DATE: | FUNDING DATE: 11/18/2005 |
|---|---|---|

| J. | SUMMARY OF BORROWER'S TRANSACTION | | K. | SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|---|---|
| 100. Gross Amount Due From Borrower: | | | 400. Gross Amount Due To Seller: | | |
| 101. Contract Sales Price | | | 401. Contract Sales Price | | |
| 102. Personal Property | | | 402. Personal Property | | |
| 103. Settlement charges to Borrower (line 1400) | 4,501.31 | | 403. | | |
| 104. Payoff to Washington Mutual | 309,682.36 | | 404. | | |
| 105. Additional Payoffs | 208,501.55 | | 405. | | |
| Adjustments For Items Paid By Seller In Advance: | | | Adjustments For Items Paid By Seller In Advance: | | |
| 106. City/Town Taxes | | | 406. City/Town Taxes | | |
| 107. County Taxes | | | 407. County Taxes | | |
| 108. Assessments | | | 408. Assessments | | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 113. | | | 413. | | |
| 114. | | | 414. | | |
| 115. | | | 415. | | |
| 120. Gross Amount Due from borrower | 522,685.22 | | 420. Gross Amount Due to Seller | | |
| 200. Amounts Paid by or in Behalf of Borrower: | | | 500. Reductions In Amount Due To Seller: | | |
| 201. Deposit or earnest money | | | 501. Excess deposit (see instructions) | | |
| 202. Principal amount of new loan(s) | 524,000.00 | | 502. Settlement charges to Seller (line 1400) | | |
| Kappel Mortgage Group | | | | | |
| 203. Existing loan(s) taken subject to | | | 503. Existing loan(s) taken subject to | | |
| 204. | | | 504. Payoff of first mortgage loan | | |
| 205. | | | 505. Payoff of second mortgage loan | | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| Adjustments For Items Unpaid By Seller: | | | Adjustments For Items Unpaid By Seller: | | |
| 210. City/Town Taxes | | | 510. City/Town Taxes | | |
| 211. County Taxes | | | 511. County Taxes | | |
| 212. Assessments | | | 512. Assessments | | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. Total Paid By/For Borrower | 524,000.00 | | 520. Total Reductions in Amount Due Seller | | |
| 300. Cash At Settlement from/to Borrower: | | | 600. Cash At Settlement to/from Seller: | | |
| 301. Gross Amount due from Borrower (line 120) | 522,685.22 | | 601. Gross amount due to Seller (line 420) | | |
| 302. Less amount paid by/for Borrower (line 220) | 524,000.00 | | 602. Less reductions in amount due Seller (line 520) | | |
| 303. Cash TO Borrower: | 1,314.78 | | 603. Cash TO/FROM Seller: | | 0.00 |

Amended Complaint, Exh A-025

ESCROW NOV. 28. 2005 12:50PM 39-806 ALLIANCE TITLE                                NO. 3326   P. 2e. 2552-2065

**L. SETTLEMENT CHARGES:**

| 700. Total Sales/Broker's Commission: | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| Based on Price $ @ % = | | | |
| Division of Commission (line 700) follows: | | | |
| 701. $ | to | | |
| 702. $ | to | | |
| $ | to | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| **800. Items Payable In Connection With Loan** | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount Fee | | | |
| 803. Appraisal Fee to Kappel Mortgage Group | | 350.00 | |
| 804. Credit Report | | | |
| 805. Lenders Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | | |
| 807. Assumption Fee | | | |
| 808. Administration Fee to First Magnus Financial Corporation | | 576.00 | |
| 809. Broker Credit to Borrower | | 1,310.00- | |
| 810. | | | |
| 811. | | | |
| Yield Spread Premium (POC) to Kappel Mortgage Group | ( $6,650.00) | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | |
| 901. Interest from 11/17/05 to 12/01/05 @$21,534/day (14 days) | | 301.48 | |
| 902. Mortgage Insurance Premium | | | |
| 903. Hazard Insurance Premium | | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited With Lender** | | | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes | | | |
| 1005. Annual Assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. Aggregate Adjustment   months @$ | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee to Alliance Title Company | | 676.25 | |
| 1102. Abstract or title search | | | |
| 1103. Title examination | | | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | | |
| 1106. Notary fees to Sherry Luman/Notaries to You | | 125.00 | |
| 1107. Attorney's Fees | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance to Alliance Title Company | | | |
| (included above item numbers: ) | | | |
| 1109. Lender's coverage $   524,000.00  to Alliance Title Company | | 1,135.00 | |
| 1110. Owner's coverage $   to Alliance Title Company | | | |
| Lender's coverage $   to Alliance Title Company | | | |
| Lender's coverage $   to Alliance Title Company | | | |
| 1111. | | | |
| 1112. Delivery/Courier Deliveries to Alliance Title Company | | 30.00 | |
| 1113. 1 day interest @$21.42 credit to Alliance Title Company Adrianne Rovel | | 21.54- | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording Fees: Deed$   Mortgage $   72.00  Release $ | | 72.00 | |
| 1202. City/County tax/stamps | | | |
| 1203. State tax/stamps | | | |
| 1204. City Transfer Tax | | | |
| 1205. County Transfer Tax | | | |
| 1206. | | | |
| 1207. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection | | | |
| 1303. Property Taxes-1st Installment to Placer Co. Tax Collector | | 1,720.12 | |
| 1304. Homeowners Insurance Premium to Allstate | | 646.00 | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1400. Total Settlement Charges (Enter on line 103,Section J -and- line 502, Section K) | | 4,501.31 | 0.00 |

Amended Complaint, Exh A-026

FAX FROM NOV. 29. 2005 12:51PM A239-ec ALLIANCE TITLE                    NO. 9525   P. 3

| BREAKDOWN OF NEW LOANS | Buyer Amount | Seller Amount |
|---|---|---|
| Description | | |
| First Magnus Financial Corporation, 3013 Douglas Blvd Suite 210, Roseville, CA 95661, Loan | 524,000.00 | |
| Kappel Mortgage Group, 2150 River Plaza Dr. Ste#205, Sacramento, Ca 95833, Loan# | | |
| Total of New Loans. | 524,000.00 | |

Amended Complaint, Exh A-027

## ADJUSTABLE RATE RIDER
### (MTA-Twelve Month Average Index - Payment Caps)

LOAN NO.: 8975002362

MIN: 100039289750023626
MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this 10th day of    NOVEMBER, 2005    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

("Lender") of the same date and covering the property described in the Security Instrument and located at:

5049 MIDAS AVENUE, ROCKLIN, CA  95677
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.  INTEREST
    (A) Interest Rate
    Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of       1.500       %. The interest rate I will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

    (B) Interest Rate Change Dates
    The interest rate I will pay may change on the   1st   day of     JANUARY, 2006   , and on that day every month thereafter. Each date on which my interest rate could change is

PayOption MTA ARM Rider                                              Initials: _A R_
FE-5315  (0505)   Page 1 of 6    LENDER SUPPORT SYSTEMS, INC. COU-5315.COU (05/05)

#7

Amended Complaint, Exh A-028

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding        THREE AND 025/1000THS        percentage point(s)        3.025        % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than        9.950        %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

3. PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the 1st   day of each month beginning on JANUARY, 2006        . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to Interest before Principal. If, on   DECEMBER 01, 2035   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at First Magnus Financial Corporation, An Arizona Corporation 603 North Wilmot Road, Tucson, AZ 85711
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $        1,806.43        unless adjusted under Section 3(F).

PayOption MTA ARM Rider
FE-5315 (0505)                     Page 2 of 6                     Initials: _AL_

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of       JANUARY, 2007       , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

PayOption MTA ARM Rider
FE-5315  (0505)                   Page 3 of 6                   Initials: _____

(F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000THS percent ( 115.000 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G) Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(H) Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)  15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

PayOption MTA ARM Rider
FE-5315 (0505)               Page 4 of 6              Initials: _nl_



Amended Complaint, Exh A-031

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PayOption MTA ARM Rider
FE-5315  (0505)                    Page 5 of 6                    Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)          _____(Seal)
ADRIANA ROVAI                     -Borrower                                        -Borrower

_____(Seal)          _____(Seal)
                                  -Borrower                                        -Borrower

_____(Seal)          _____(Seal)
                                  -Borrower                                        -Borrower

_____(Seal)          _____(Seal)
                                  -Borrower                                        -Borrower

PayOption MTA ARM Rider
FE-5315  (0505)                          Page 6 of 6

Exhibit "B"

SPS SELECT
PORTFOLIO
SERVICING, INC.
P.O. Box 65250
Salt Lake City, UT 84165-0250

## IMPORTANT TAX INFORMATION

Loan Number:                                    0012785937

Social Security /
Tax Identification Number:

ADRIANA ROVAI
5049 MIDAS AVE
ROCKLIN CA 95677-2270

## MORTGAGE INTEREST STATEMENT - SUBSTITUTE FORM 1098

We are required to provide the following information (except the Escrow Summary) to the Internal Revenue Service. If you are required to file a tax return and the IRS determines that you underpaid tax by overstating a deduction for the mortgage interest or points shown below, or by failing to report a refund of interest on your return, you may have to pay a negligence penalty or other sanction.

☐ **CORRECTED** (if checked)                          **2011**

**Lender's Information:**
Select Portfolio Servicing, Inc
P.O. Box 65250
Salt Lake City, UT 84165-0250
Lender's Federal Identification No. 87-0465626

**Borrower's Information:**
ADRIANA ROVAI

5049 MIDAS AVENUE
ROCKLIN, CA 95677

### ESCROW SUMMARY

| | |
|---|---|
| Beginning Escrow Balance | $.00 |
| **Additions to Escrow** | |
| Deposits* | $.00 |
| **Subtractions from Escrow** | |
| **Ending Escrow Balance** | $.00 |
| *Includes      $.00   in Escrow Interest | |

### INTEREST SUMMARY

Box 1 - Mortgage interest received from borrower*      $1,443.58

For more information on each box see reverse side.

*Caution: This is the amount we reported to the IRS as the amount of interest you can deduct this year. You may not be able to take a full deduction for the amount of interest shown. Limits based on the loan amount and the cost and value of the secured property may apply. You can deduct only the interest that you incur and actually pay for, and which you were not reimbursed by us or by another person.

### PRINCIPAL ACTIVITY

| | |
|---|---|
| Principal Applied | $1,254.62 |
| Remaining Balance | $531,758.40 |

If you have any questions regarding this statement, please contact our Customer Service Department at 1-800-258-8602, between the hours of 7 a.m. and 8 p.m. Monday through Friday and Saturday from 8 a.m. to 12 p.m. Eastern Time. You may also write to us at P.O. Box 65250, Salt Lake City, UT 84165-0250.

**See Reverse Side for Additional Information.**

0012785937

IT700

Amended Complaint, Exh B-034

Select Portfolio Servicing, Inc
P.O. Box 65250
Salt Lake City, UT 84165-0250

**ADRIANA ROVAI**

RE: Loan No. 0012785537

---- ACCOUNT ACTIVITY STATEMENT ----

| TRANSACTION DESCRIPTION | PROCESS DATE | DUE DATE | TOTAL AMOUNT | PRINCIPAL AMOUNT | INTEREST AMOUNT | ESCROW AMOUNT | FEES | OPTIONAL INSURANCE | MISC |
|---|---|---|---|---|---|---|---|---|---|
| LOAN SETUP | 12/08 | 12/11 | $0.00 | $533,013.02- | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 12/12 | 12/11 | $2,698.20 | $1,254.62 | $1,443.58 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 12/12 | 01/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 12/12 | 01/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

14381

Amended Complaint, Exh B-035

Exhibit "C"



**Mortgage Interest Statement**

OMB No. 1545-0901

2012

Form **1098**

RECIPIENT'S/LENDER'S name, address, and telephone number
WELLS FARGO BANK, N. A.
4101 WISEMAN BOULEVARD
SAN ANTONIO TX 78251-4201
(800) 642-0257

* Caution: The amount shown may not be fully deductible by you. Limits based on the loan amount and the cost and value of the secured property may apply. Also, you may only deduct interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person.

**Copy B**
**For Payer/Borrower**

The information in boxes 1, 2, and 3 is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if the IRS determines that an underpayment of tax results because you overstated a deduction for this mortgage interest or for these points or because you did not report this refund of interest on your return.

RECIPIENT'S federal identification no.
94-1347393

PAYER'S social security number

1 Mortgage interest received from payer(s)/borrower(s)*
$  14,639.17

PAYER'S/BORROWER'S name, Street address (including apt. no.), City, state, and ZIP code

2 Points paid on purchase of principal residence
$

3 Refund of overpaid interest
$

4

Account number (see instructions)

LOAN TYPE CONV. RES

Form **1098**     (keep for your records)     Department of the Treasury - Internal Revenue Service

---

KEEP THIS FORM FOR YOUR RECORDS AND FOR TAX PURPOSES.  WE CANNOT ADVISE
YOU WITH RESPECT TO YOUR TAX RETURN.  QUESTIONS CONCERNING YOUR TAX
RETURN SHOULD BE ANSWERED BY YOUR TAX ADVISOR.

```
                              DISBURSEMENT ACTIVITY:
                           PROPERTY TAXES            3,280.98
INTEREST ON ESC        21.84    HAZARD INSURANCE              .00
CURR TOTAL PMT      1,623.97    FHA/PMI  INSURANCE            .00
CURR ESCROW PMT       269.06    ADDT'L ASSESSMENTS           .00
                                ESCROW REFUND              54.17
     PRINCIPAL ACTIVITY 2012:
  PAYMENTS APPLIED      5,586.71
  REMAINING BAL       421,151.41

     ESCROW ACTIVITY 2012:
  BEGIN ESCROW BAL     1,115.85
  TOTAL DEPOSITS       2,976.71
  TOTAL DISBURSE       3,335.15
  CLOSING ESC BAL        757.41
CLOSING ESCROW BALANCE IS BEING HELD FOR PAYMENT OF BILLS AS THEY BECOME DUE.

TOTAL INTEREST APPLIED IN 2012  (NEXT DUE DATE 01/15/13)      13,912.65
  PLUS      PAYMENTS APPLIED TO PREVIOUSLY DEFERRED INT          726.52
2012 NET INTEREST PAYMENTS REPORTED TO IRS  **************    14,639.17
```

            YOU MAY OBTAIN ADDITIONAL COPIES OF THIS
         STATEMENT UPON REQUEST, SUBJECT TO APPLICABLE FEES.

# Exhibit "D"

**SPS** SELECT
PORTFOLIO
SERVICING, INC
P.O. Box 65250
Salt Lake City, UT 84165-0250

## IMPORTANT TAX INFORMATION

Loan Number: 0012785937

Social Security /
Tax Identification Number: ▮▮▮▮▮▮▮▮

10204

ADRIANA ROVAI
5049 MIDAS AVE
ROCKLIN CA 95677-2270

## MORTGAGE INTEREST STATEMENT - SUBSTITUTE FORM 1098

The information in boxes 1, 2, and 3 is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if the IRS determines that an underpayment of tax results because you overstated a deduction for this mortgage interest or for these points or because you did not report this refund of interest on your return.

| ☐ CORRECTED (if checked) | 2012 |
|---|---|

**Lender's Information:**
Select Portfolio Servicing, Inc
P.O. Box 65250
Salt Lake City, UT 84165-0250
Lender's Federal Identification No. 87-0465626

**Borrower's Information:**
ADRIANA ROVAI

5049 MIDAS AVENUE
ROCKLIN, CA 95677

### ESCROW SUMMARY

| | |
|---|---|
| Beginning Escrow Balance | $.00 |
| **Additions to Escrow** | |
| Deposits* | $.00 |
| **Subtractions from Escrow** | |
| **Ending Escrow Balance** | $.00 |
| *Includes $.00 in Escrow Interest | |

### INTEREST SUMMARY

| | |
|---|---|
| Mortgage Interest Paid in 2012 | $18,021.12 |
| Plus Late Charges Paid | $251.16 |
| Total Interest | $18,272.28 |
| Box 1 - Mortgage interest received from borrower* | $18,272.28 |

For more information on each box see reverse side.

*Caution. The amount shown may not be fully deductible by you. Limits based on the loan amount and the cost and value of the secured property may apply. Also, you may only deduct interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person.

### PRINCIPAL ACTIVITY

| | |
|---|---|
| Principal Applied | $16,576.50 |
| Remaining Balance | $515,181.90 |

If you have any questions regarding this statement, please contact our Customer Service Department at 1-800-258-8602, between the hours of 7 a.m. and 8 p.m. Monday through Friday and Saturday from 8 a.m. to 12 p.m. Eastern Time. You may also write to us at P.O. Box 65250, Salt Lake City, UT 84165-0250.

10204

**See Reverse Side for Additional Information.**

0012785937

IT700

Amended Complaint, Exh D-037

Select Portfolio Servicing, Inc
P.O. Box 65250
Salt Lake City, UT 84165-0250

ADRIANA ROVAI

RE: Loan No. 0012785937

---- ACCOUNT ACTIVITY STATEMENT ----

| TRANSACTION DESCRIPTION | PROCESS DATE | DUE DATE | TOTAL AMOUNT | PRINCIPAL AMOUNT | INTEREST AMOUNT | ESCROW AMOUNT | FEES | OPTIONAL INSURANCE | MISC |
|---|---|---|---|---|---|---|---|---|---|
| PAYMENT | 01/04 | 01/12 | $2,661.53 | $1,221.35 | $1,440.18 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 01/04 | 02/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 02/03 | 02/12 | $2,661.53 | $1,224.66 | $1,436.87 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 02/03 | 03/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| LATE CHARGE ASSESSMENT | 03/16 | 03/12 | $0.00 | $0.00 | $0.00 | $0.00 | $133.08- | $0.00 | $0.00 |
| PAYMENT | 03/26 | 03/12 | $2,794.61 | $1,227.98 | $1,433.55 | $0.00 | $133.08 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 03/26 | 04/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| LATE CHARGE ASSESSMENT | 04/16 | 04/12 | $0.00 | $0.00 | $0.00 | $0.00 | $133.08- | $0.00 | $0.00 |
| PAYMENT | 04/26 | 04/12 | $2,661.53 | $1,231.30 | $1,430.23 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 04/26 | 05/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 04/26 | 05/12 | $15.00 | $0.00 | $0.00 | $0.00 | $15.00 | $0.00 | $0.00 |
| PAYMENT | 05/04 | 05/12 | $2,779.61 | $1,289.52 | $1,372.01 | $0.00 | $118.08 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 05/04 | 06/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 06/11 | 06/12 | $2,661.53 | $1,292.87 | $1,368.66 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 06/11 | 07/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 07/12 | 07/12 | $2,661.53 | $1,296.24 | $1,365.28 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 07/12 | 08/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 08/13 | 08/12 | $2,661.53 | $1,299.62 | $1,361.91 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 08/13 | 09/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 09/12 | 09/12 | $2,661.53 | $1,303.00 | $1,358.53 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 09/12 | 10/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 10/11 | 10/12 | $2,661.53 | $1,306.39 | $1,355.14 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 10/11 | 11/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 11/13 | 11/12 | $2,661.53 | $1,309.80 | $1,351.73 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 11/13 | 12/12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 12/03 | 12/12 | $2,661.53 | $1,313.21 | $1,348.32 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 12/03 | 01/13 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PAYMENT | 12/31 | 01/13 | $2,659.26 | $1,260.56 | $1,398.70 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARM LOAN ADJUSTMENT | 12/31 | 02/13 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

# Exhibit "E"

 **IRS** Department of the Treasury
Internal Revenue Service

In reply refer to: ████████
Nov. 05, 2012  LTR ████ A1

Input Op: ████████
BODC: ████



Taxpayer Identification Number:
             Tax Period: Dec. 31, 2010
             Tax Form: 1040

Dear ███████████████:

Thank you for your response of July 11, 2012.

We cannot accept your Form 1040X Amended U.S. Individual Income Tax
Return as filed. ████████████████ We also cannot adjust the amount
claimed on Schedule A for home mortgage interest, without a corrected
Form 1098 from ████████████ verify that you paid the additional
mortgage interest.



If you have any questions about this letter, you may call
Office of ████████ between 7:00 AM and 8:00 PM EDT at ████████
████████ for assistance. You may also fax us at ████████

Whenever you write to us, or wish us to respond to you by phone,
please give us your telephone number, including an area code, the
hours we can reach you, a person to contact, and a copy of this

Exhibit "F"

**Mineeh P. Lapid**

| | |
|---|---|
| **From:** | David J. Vendler |
| **Sent:** | Friday, February 08, 2013 2:23 PM |
| **To:** | Macnabb Jill |
| **Cc:** | jeffrey@jdpoindexterlaw.com; mbrown@mrbapclaw.com |
| **Subject:** | RE: Horn v. Bank of America -- Underreporting of Morgage Interest by Bank of America |

Dear Ms. McNabb:

Thank you for speaking with you today. I know it was a lot of information to assimilate in one phone call, but the fundamental issue is very simple.

My client has what is known as a negative amortization ("Option ARM") mortgage with Bank of America. My lawsuit (Horn v. Bank of America (Southern District of California case No. 3:12-cv-01718-GPC-BLM) contends that Bank of America ("BOFA") is underreporting mortgage interest on millions of consumer 1098 forms. The example I gave you over the phone best makes the point about what BOFA is doing wrong.

Assume that John Doe has a BOFA negative amortization loan in the amount of $100k where the *interest* obligation is $1,000 per month, and where the "minimum payment" allowed under his note is only $750 per month. Assume further that in the first month, Mr. Smith elects to pay the minimum payment of $750 and thus "defers" $250 of the interest due for that month. In month 2, however, Mr. Smith elects to pay $1,250, i.e. the full $1,000 in interest due for that month plus an additional $250. Finally, assume that in months 3-12, Mr. Smith pays the full $1,000 per month due in interest. For the purposes of Mr. Smith's 1098 form, how much deductible mortgage interest has he paid?   My position is $12,000.  BOFA's position is $11,750.

According to BOFA, once the consumer elects to defer the payment of $250 in month 1, that amount is "added to the principal balance of your loan" and thus is no longer interest when it is repaid, but is principal.  (Interestingly other banks like Wells Fargo do not do this, but treat payments of previously deferred interest as interest and report those amounts on customers' 1098 forms).

The case of Motel Corporation v. Commissioner of Internal Revenue, 54 T.C. 1433 (1970) (attached) explains why Bank of America's position is wrong.

In that case, Motel Corporation issued a mortgage note to Barrett as part of Barrett's purchase of a motel owned by Motel Corporation.  In the year 1962, Barrett's interest obligation under the mortgage note was $15,240.19, but Barrett only paid $12,000.  In 1963, however, Barrett made payments totaling $19,200.  This amount not only covered the $12,893.26 due in interest for 1963, but also more than covered the $3,240.19 shortfall from 1962.

In its tax return for 1963, Motel Corporation relied on the same exact rationale that Bank of America is relying on by claiming that the $3,240.19 interest shortfall from 1962 had been "added to the principal" of Barrett's loan, such that when that amount was paid in 1963, it was not income to Motel Corporation, but a repayment of principal.  The IRS rejected Motel Corporation's position and claimed Motel Corporation should have included not only the $12,893.26 in interest for 1963, but also the $3,240.19 that had accrued in 1962, but which was paid in 1963.  In siding with the IRS, the United States Tax Court made clear that interest does cannot change its character to principal simply because the borrower elects to defers payment of it from the date it was originally due.  As the Tax Court put it:

> In reaching this conclusion, we start from two basic premises.  The first is that interest is compensation for the use of money.  Deputy v. DuPont, 308 U.S. 488 (1940).  The second is the fundamental proposition of tax law that in determining the tax treatment of a transaction, substance governs form.  Gregory v. Helvering, 293 U.S.

1

465 (1935). Viewed substantively, we can perceive no reason why defaulted interest should be transformed into principal for purposes of tax law. Such interest, no matter when paid, is clearly compensation for the use of money, and its character as such does not change merely because it is not timely paid. The fact that a payment is not called 'interest' is not controlling for tax purposes if, in substance, it is such. See Wilshire Holding Corporation v. Commissioner, 262 F.2d 51 (C.A. 9, 1958).

Id. at 1440. The Court further stated:

Having concluded that defaulted interest does not become principal for tax purposes, we must next consider when such interest is treated as paid. Partial payments on a note are generally treated as first applying to interest and then to reduce principal. Estate of Daniel Buckley, 37 T.C. 664 (1962); Estate of Paul M. Bowen, 2 T.C. 1 (1943); Theodore R. Plunkett, 41 B.T.A. 700 (1940), affd. 118 F.2d 644 (C.A. 1, 1941). This rule was expressly included in the Barrett note.[ ] Since each payment made in 1962 was less than the interest accrued and unpaid to the date of the payment, the entire amount of the payments made in that year were allocable to the payment of interest and taxable as such. Since $16,133.45 of the amounts paid in 1963 is applicable to interest accrued and unpaid at the date of the payments, that amount is allocable to the payment of interest in that year and taxable as such.

There is no question that the amounts of interest consumers elected to defer paying to Bank of America are "interest" as defined by the Supreme Court in Dupont, namely money charged in compensation for the use of borrowed funds. Indeed, not even Bank of America would contest that if the consumers paid the amounts they elected to defer on a timely basis, Bank of America would have included those amounts on the consumers' 1098 forms as payments of mortgage interest. Like Motel Corporation, Bank of America's position entirely relies on the election to defer those interest payments until a later time to "transform" the character of the obligation from interest to principal. But as explained by the Tax Court, "for purposes of tax law" interest's "character as such does not change merely because it is not timely paid." Therefore, the interest the consumers initially deferred, but later paid, is "interest," and should have been reportable by Bank of America on consumers' 1098 forms pursuant to I.R.C. Section 6050H. (The Tax Court's opinion in Motel Corporation is also consistent with the tax treatment of deferred interest in the student loan context. See 26 C.F.R. § 1.6050S–3).

So, the basis for my suit can be distilled as follows:

I.R.C. Section 163(a) states that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

Clemens v. USV Pharmaceutical, A Div. of Revlon, Inc., 838 F.2d 1389 (5th Cir. 1988) establishes that the recipient of an informational return (such as a Form 1098) suffers an injury in fact and has standing to sue the issuer to correct errors on the return (and to seek resulting accountancy fees).

My concern, however, and the reason I contacted Ms. Dusenberry, is that even if I am correct on the law, and even if I can force BOFA to issue corrected 1098 forms for all the years at issue, consumers may still lose out because of the three year statute of limitations for filing amending returns. Thus, I asked Ms. Dusenberry – and now you – whether the Service would be interested in appearing as an amicus in my case? Or, might the service be willing/able to waive the 3 year period statute of limitations for the consumers in my class? Finally, might the IRS undertake an audit of BOFA to force it to comply and provide new 1098's to affected consumers? In this last regard, since penalties for false reporting might be involved, I want to reference that my client (Richard Horn) filed a whistleblower report (IRS Case No. 2012-006452) some months ago about BOFA's erroneous 1098 reporting.

Finally, after our call, I submitted the systematic report as you requested on the website. The 2000 character limit was constraining, but I trust that this full version will assist you in helping to resolve the problems I have identified.

I look forward to hearing from you soon.  My cell phone is the best way to get me.  You can call at any time.  (213) 700-5194.

Yours,

David Vendler

**From:** Macnabb Jill [mailto:Jill.Macnabb@irs.gov]
**Sent:** Friday, February 08, 2013 1:32 PM
**To:** David J. Vendler
**Subject:** interest case

Dear Mr. Vendler,

Thank you for speaking with me today.

*Jill MacNabb*
*Attorney Advisor, National Taxpayer Advocate*
☎ 202.622.6297
🖷 202.927.3365
💻 *Jill.MacNabb@irs.gov*

3

**Mineeh P. Lapid**

| | |
|---|---|
| **From:** | sams.web@irs.gov |
| **Sent:** | Thursday, February 21, 2013 1:20 PM |
| **To:** | David J. Vendler |
| **Subject:** | Regarding Your Systemic Advocacy Issue Submission |

Thank you for your advocacy issue submission:  Underreporting Mortgage Interest By BOFA, which was assigned control number 26487 on the Systemic Advocacy Management System (SAMS).

In reviewing your submission, we determined it is not an issue under the purview of the Systemic Advocacy Program. The issue does not fall within the structure of a systemic problem, but rather involves interpretation of legal matters.

If you know or suspect an individual or company is not complying with the tax laws, you may report this activity to the Treasury Inspector General for Tax Administration (TIGTA) by completing Form 3949-A, Information Referral, as described in the article available at http://www.irs.gov/individuals/article/0,,id=106778,00.html.

Every submission helps us identify trends, which lead to new approaches to improving the IRS and tax administration. Many also provide persuasive examples and data for the National Taxpayer Advocate's Annual Report to Congress.  If you have further questions on your submission, you may contact our office at systemic.advocacy@irs.gov.  If you do, please refer to the issue number above.  Thank you for your submission and participating in the Systemic Advocacy Program.

1

Amended Complaint, Exh F-043

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) years and am not a party to the within action.

On April 26, 2017, pursuant to the Court's Electronic Filing System, I submitted an electronic version of the following document(s) via file transfer protocol to ECF (Electronic Case Filing):

**FIRST AMENDED CLASS ACTION COMPLAINT FOR: 1. BREACH OF CONTRACT; 2. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; 3. VIOLATION OF UNFAIR COMPETITION LAW; 4. DECLARATORY RELIEF; 5. INJUNCTIVE RELIEF; 6. FRAUD; 7. NEGLIGENCE; 8. NEGLIGENT MISREPRESENTATION; 9. VIOLATION OF 26 U.S.C. § 6050H; DEMAND FOR JURY TRIAL**

and true copy of this document was served electronically upon all counsel of record by the Court's CM/ECF System, or if such service is not authorized, by first class mail, in accordance with Rule 5 of the Federal Rules of Civil Procedure.

Jeff E. Scott, Esq.
scottj@gtlaw.com
Jennifer L. Gray, Esq.
grayjen@gtlaw.com
GREENBERT TRAURIG LLP
1840 Century Park East
Los Angeles, CA 90067
Telephone:   (310) 586-7700
Facsimile:   (310) 586-7800

*Attorneys for Defendant SELECT PORTFOLIO SERVICING, INC.*

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on April 26, 2017, at Los Angeles, California.

Mineeh P. Lapid